## TWEEDIE TRADING CO. v. LAGUNA CO.

(District Court, E. D. New York. April 15, 1910.)

1. EVIDENCE (§ 448*)—WRITTEN CONTRACTS—PAROL EVIDENCE—AMBIGUITY.

Where a letter purporting to authorize the charterer of a vessel to cancel the charter was ambiguous, parol evidence of the circumstances surrounding the transaction was admissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2066–2084; Dec. Dig. § 448.*]

2. SHIPPING (§ 38*)—CHARTERS—CANCELLATION—MISTAKE—DAMAGES.

Where a letter authorizing the cancellation of a charter was so written by mistake as to give the cancellation option to the charterers, instead of the owners, as intended, and when the charterers' attention was called to the mistake correction was refused, and, the owners having repudiated the letter as written, the charterers canceled the charter without having suffered any loss or changed their position before the mistake was called to their attention, the owners, having thereafter presented the vessel to the charterers in accordance with the original charter party, and

it being refused, were entitled to recover damages sustained as for breach of contract.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 136–140; Dec. Dig. § 38.*

Cancellation, surrender, or rescission of charter of vessel, see note to McNear v. Leblond, 61 C. C. A. 569.]

In Admiralty. Libel by the Tweedie Trading Company against the Laguna Company. Judgment for libelant.

Ralph James M. Bullowa, for libelant.

Albert E. Seibert, for respondent.

CHATFIELD, District Judge. The libelant has brought an action against the respondent for damages alleged to have followed from the refusal to perform the conditions of a charter party made January 29, 1907, under which the libelant was to furnish the steamship Dundonian for two voyages from New York to Laguna, Mexico, to bring back from that port a quantity of cedar, mahogany, and miscellaneous cargo at a certain charter rate. The Dundonian is shown by the testimony to be a ship suitable and unusually fitted for the purpose, because of her light draft in proportion to her cargo-carrying capacity. The first voyage was completed, but with certain delays and disputes because of quarantine conditions and other matters, which rendered it possible that the libelant would have difficulty in furnishing that vessel for the second voyage, unless the questions in dispute with third parties, as to which a libel could be filed, should be adjusted or the vessel released upon bond.

Under these circumstances, the president of the libelant company had certain negotiations with the manager of the lumber department of the respondent, resulting in an adjustment of the various items in dispute between them, at a time when it was expected that the libel threatened by third parties could be released by the giving of a bond. Thus the libelant hoped to avoid the possibility of difficulties in furnishing the Dundonian for the second voyage.

During the conversations in which these negotiations were in progress (but which party first suggested it is not satisfactorily proven) the possibility of having to substitute a different ship for the Dundonian in case she could not be released was spoken of, and the alternative proposition of the cancellation of the contract also seems to have been referred to.

Mr. Tweedie, the president of the libelant, dictated a letter covering the matters in dispute upon other points, and according to Mr. Hill, the agent of the respondent, the matter of substituting a different vessel was embodied in a separate letter, which was dictated to a stenographer and written out by the stenographer subsequent to the writing of the first letter directly upon the machine. Some interval, emphasized by Mr. Tweedie's leaving the office and making a purchase, which is remembered by both parties, seems to have elapsed before the second, or possibly either of the letters were signed, and according to Mr. Tweedie's recollection he came back to sign the second letter;

whereas, according to Mr. Hill's recollection, the original of the second letter had already been signed, and he called Mr. Tweedie back to sign the carbon copy.

However this may be, the second letter, which is as follows (the words in italics being in Tweedie's handwriting, while the balance of the letter is in typewriting), was signed by both parties:

"May 15th, 1907.

"Alex. Hollander & Co., for the Laguna Company, New York City.

"Dear Sirs: In view of the difficulties with the owners of the S. S. Dundonian, we give you permission in case you desire to substitute another steamer in place of the Dundonian for the second voyage of our contract, *or if you prefer to cancel the contract, or if you prefer to stick to the contract for the Dundonian.*

"Yours truly,                 *The Tweedie Trading Co.,*
                                "*By M. Stanley Tweedie, President.*

"*We confirm this agreement,*
        "Alex. Hollander & Co., Agts. Laguna Co."

It is claimed by Mr. Tweedie that this was intended to be a concession from the Laguna Company to the Tweedie Trading Company, but was signed by him in the wrong place, or otherwise the pronouns of the first person should have been changed to those of the second.

An examination of the previous letter, which is of much greater length, shows changes of "we" to "you" and of "you" to "we" in one sentence; but no such corrections were made in the second letter.

The portion in handwriting in the second letter (giving the respondent the right to cancel the contract or to continue it, if they wished to substitute another steamer in place of the Dundonian) appears in the light of subsequent events to have been a valuable privilege, inasmuch as the respondent is shown to have canceled the contract the following day, and the libelant claims that he was damaged thereby and that the respondent benefited.

But the privilege of substituting another boat was of vital importance to the libelant, and under the circumstances it is impossible to find that Mr. Tweedie intended to give up his rights and to surrender the contract which he was making such great efforts to be in a position to carry out.

Mr. Hill's recollection of the conversation is to the effect that the talk was according to the tenor of the second letter as signed, and he now claims that he noticed the form in which the letter was written at the time it was signed by Mr. Tweedie and by a clerk in the office of the agents of the Laguna Company, where the interview was being held. Mr. Tweedie, on the contrary, testifies that the only proposition for cancellation was for the libelant's benefit, if the Dundonian could not be released, and if no other vessel was available. Soon after leaving the office with a copy of the letter, Mr. Tweedie noticed that the privilege of cancellation and substitution was apparently given to the respondent, instead of the libelant, and immediately sent a clerk, Mr. Moore, to Mr. Hill. This clerk thereupon called up Mr. Tweedie, and conversation with Mr. Hill was had, at which Mr. Hill said he would have to communicate with his principals. Upon the following day he refused to change the form of the letter, and was thereupon notified by Mr. Tweedie that the libelant would refuse to be bound

thereby, and immediately the respondent gave notice of cancellation under its alleged rights given by this letter.

The different transactions seem to have been a matter of one negotiation, such that there was sufficient consideration for the various parts of the agreement, even though they were separately placed in two letters, because of a difference in the positions of the parties signing for the Laguna Company. The language of the letter above set forth is ambiguous, so that it is necessary to consider oral testimony as to the entire transaction in reaching a conclusion as to what the rights of the parties are.

The libelant claims that the contract is void because of a mistake of fact, in that, as he alleges, Mr. Hill knew at the time of signing that the letter did not express the intent of Mr. Tweedie. The respondent, on the other hand, claims that if Mr. Tweedie was mistaken, either in fact as to the language dictated by him in the letter, or as to the manner in which he signed the letter, nevertheless that he (Hill) was not laboring under any mistake; that Tweedie expressed himself in such a way that Hill had no reason to suppose that Tweedie did not intend the plain meaning of the words which he used; and that, therefore, the minds of the parties met, even if Tweedie had supposed he was presenting a different proposition, and did not realize the consequences of his statements and of the contract as he finally assented to it.

If Mr. Tweedie's contention be right, the libelant was at once entitled to hold the respondent to its contract, and to insist on a correction of the mistake, or to a reformation of the new option. His present action is for damages caused by the failure of the respondent to carry out the original contract. and the respondent sets up the alleged modification as a defense. The developments have made it unnecessary for the libelant to bring an action to reform the so-called option alleged to have been void because of mistake, and the rights of the parties can be fully adjusted in this action for the breach of the original contract.

It would appear from the testimony that a clear mistake of fact existed on the part of Mr. Tweedie, and that Mr. Hill should have known or did know that Mr. Tweedie intended to have the letter set forth above signed by the respondent and accepted by himself, and, even if Mr. Tweedie misspoke, that there was no meeting of their minds with respect to allowing the respondent the right to cancel this contract, as to which, as has been said, the libelant was making diligent efforts to be able to carry out.

It would appear from the testimony that Mr. Hill may have noticed the mistake and realized the proposal Mr. Tweedie was making; and, on the other hand, it may be that Mr. Hill has not correctly remembered portions of the agreement represented by the clauses in which the pronouns were changed from the second to the first person, and vice versa. It is evident that, when his attention was called to the matter a short time after signature, he was in doubt as to whether the matter were one of mistake or of deliberate intent on his part, and his recollection of the interview would naturally be affected by discussion as to whether Mr. Tweedie could be held upon the language signed by

him. Mr. Tweedie's testimony, on the other hand, is so plain, and it is so evident that a mistake was made, that the court is satisfied that no meeting of minds ever occurred, nor did Mr. Tweedie ever consent or assent to the proposition expressed in the letter in such a way that he should be held bound thereby.

The respondent had suffered no loss, and the testimony shows that its position did not change before the mistake was called to its attention. It has apparently been enriched at the expense of the libelant because of the mistake of fact. The libelant might have sought relief because of the wrongful act of the respondent in refusing to make the corrections requested before the positions of the parties had changed, and of the wrongful cancellation of the contract. But inasmuch as the Dundonian was actually presented according to the terms of the original charter party, for the purpose of carrying out that original contract according to its terms, and inasmuch as the respondent refused to carry out its contract after notice that the so-called modification was void because of the mistake of fact, the libelant was in a position to recover, and should have a decree for the damages caused by the respondent's breach of the original contract under those circumstances.